**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NEUBER ENVIRONMENTAL SERVICES, INC. | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WARNER JENKINSON COMPANY AND SENSIENT COLORS TECHNOLOGIES CORPORATION D/B/A SENSIENT TECHNICAL COLORS, INC. | : | |
| | : | |
| Defendant. | : | |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant Warner Jenkinson Company and Sensient Colors Technologies Corporation d/b/a Sensient Technical Colors ("Sensient"), by and through their undersigned counsel, hereby notice removal of this civil action from the Court of Common Pleas of Berks County, Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania. In support of this Notice, the Defendant avers as follows:

1. On May 16, 2005, the Plaintiff, Neuber Environmental Services, Inc. ("Neuber"), filed a Complaint captioned Neuber Environmental Services, Inc. v. Warner Jenkinson Company and Sensient Colors Technologies Corporation d/b/a Sensient Technical Colors, in the Court of Common Pleas of Berks County, Pennsylvania, Case No. 04-15018 (hereinafter the "Action"), a true and correct copy of which is attached hereto as Exhibit A.

2.   Defendant Sensient was served with a copy of the Complaint on May 26, 2005.

3.   As more fully set out below, this Court has jurisdiction over the state court action pursuant to 28 U.S.C. § 1332 because it is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and it is between citizens of different states.

4.   For the foregoing reasons, Defendant Sensient is entitled to remove this Action to this Court pursuant to 28 U.S.C. § 1441.

I.   **SENSIENT HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.**

5.   This Notice of Removal is being timely filed pursuant to 28 U.S.C. § 1446(b) because it is filed within thirty days of service on all properly served defendants. Sensient was served with the Complaint on May 26, 2005.[1]

6.   Sensient is the only defendant in this action.  Therefore, Sensient need not obtain the consent of any other party to remove this action.

7.   Venue is proper in this Court pursuant to 28 U.S.C. § 118(a) because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

8.   No previous application has been made for the relief requested herein.

---

[1]   Thirty days from May 26, 2005, was Saturday June 25, 2005.  In accordance with Federal Rule of Civil Procedure 6 regarding the computation of time, the last day of any given time period under the federal rules will not be counted if it is a Saturday or Sunday. Accordingly, the thirty-day time period includes Monday, June 27, 2005.

9.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiffs, and a copy is being filed with the Prothonotary's Office for the Berks County Court of Common Pleas.

## II.     REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between citizens of different states.

11.     It is apparent from the face of the Complaint that Plaintiffs seek recovery of an amount in excess of $75,000, exclusive of costs and interest.  In its Complaint, Plaintiff demands judgment of an amount in excess of $723,277.18.

13.     There is complete diversity between Plaintiff and Sensient, the only defendant.

14.     According to the Complaint, the Plaintiff is a Pennsylvania Corporation. *See* Compl. ¶ 1.  Accordingly, upon information and belief, Plaintiff is a Pennsylvania citizen for the purpose of diversity jurisdiction.  *See* 28 U.S.C. § 1332(c)(1).

15.     Sensient is, and was at the time Plaintiffs commenced this action, a corporation organized under the laws of the State of Wisconsin with its principal place of business at 777 East Wisconsin Avenue, Milwaukee, Wisconsin and, therefore, is a citizen of Wisconsin for purposes of determining diversity.  28 U.S.C. § 1332(c)(1).

16.     Accordingly, this Court has original jurisdiction over the action pursuant to 28 U.S.C. § 1332 and the case may be removed pursuant to 28 U.S.C. § 1441 because there is

complete diversity of citizenship between the Plaintiff and the Defendant, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

WHEREFORE, the Defendant notices removal of this Action from the Court of Common Pleas of Berks County, Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1441 and 1446.

Michael A. Bogdonoff, Esq.
(Pa ID 39961)
David K. Inscho, Esq.
(Pa ID 90267)
DECHERT LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103-2793
(215) 994-4000

Attorneys for Defendant

Dated: 6/27/05

- 4 -

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date caused the foregoing Notice of Removal to be served by first class mail as follows:

> Paul A. Logan
> Frederick M. Brehm
> POWELL, TRACHTMAN, LOGAN,
> CARRLE & LOMBARDO, P.C.
> 475 Allendale Road, Suite 200
> King of Prussia, PA 19406

> Attorney for Plaintiff

David K. Inscho
DECHERT LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA  19103-2793
(215) 994-4000

Attorney for Defendant

Dated: 6/27/05

# Exhibit A

**POWELL, TRACHTMAN, LOGAN,**
**CARRLE & LOMBARDO, P.C.**
BY:   Paul A. Logan – Attorney ID No. 30119
BY:   Frederick M. Brehm – Attorney ID No. 78376
475 Allendale Road, Suite 200
King of Prussia, PA 19406
T:  (610) 354-9700 / F: (610) 354-9760

RECEIVED
PROTHONOTARY'S OFFICE

2005 MAY 16 P 4: 17

BERKS COUNTY, PA
MARIANNE R. SUTTON
PROTHONOTARY

Attorneys for Plaintiff

| | |
|---|---|
| NEUBER ENVIRONMENTAL SERVICES, INC.<br><br>v.<br><br>WARNER JENKINSON COMPANY, INC. and SENSIENT TECHNOLOGIES CORPORATION d/b/a SENSIENT TECHNICAL COLORS | IN THE COURT OF COMMON PLEAS OF BERKS COUNTY, PENNSYLVANIA<br><br>No.  04–15018 |

### NOTICE TO DEFEND

| | |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.<br>    IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | AVISO<br>Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br>    LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO. VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |

Berks County Lawyer Referral Service
544 Court Street
Reading, PA 19601
610-375-4591

KOP:313282v1 4834-02

KOP:289487v1 4834-02

**POWELL, TRACHTMAN, LOGAN,**
     **CARRLE  & LOMBARDO, P.C.**
By:    Paul A. Logan - Attorney ID No. 30119
By:    Frederick M. Brehm - Attorney ID No. 78376
475 Allendale Road,  Suite 200
King of Prussia, PA 19406
Telephone:  (610) 354-9700 / Fax: (610) 354-9760
Attorney for Plaintiffs

---

| | |
|---|---|
| NEUBER ENVIRONMENTAL SERVICES, INC.<br>42 Ridge Road<br>Phoenixville, PA 19460<br><br>vs.<br><br>WARNER JENKINSON COMPANY, INC.<br>and SENSIENT TECHNOLOGIES<br>CORPORATION d/b/a SENSIENT<br>TECHNICAL COLORS<br>2529 Main Street<br>Birdsboro, PA 19508 | IN THE COURT OF COMMON PLEAS OF<br>BERKS COUNTY, PENNSYLVANIA<br><br>No. 04-15018 |

## COMPLAINT

1.    Plaintiff Neuber Environmental Services, Inc. ("NESI") is a Pennsylvania corporation, with its principal place of business located at 42 Ridge Road, Phoenixville PA 19460.

2.    Defendant Warner Jenkinson Company, Inc. and Sensient Technologies Corporation d/b/a as Sensient Technical Colors, ("Sensient") is a business corporation with a principal place of business located at 2529 Main Street, P.O. Box 610, Birdsboro, PA 19508.

### Factual Background

3.    Prior to February, 2001, Crompton & Knowles Colors Inc., the predecessor to Sensient, retained the services of Advanced GeoServices, Inc., ("AGS") for the purposes of

analyzing the feasibility of, and thereafter preparing professionally engineered design and construction documents for, the "rejuvenation" of Impoundment No. 4A at Sensient's Birdsboro site. ("Project").

4.      All bid documents, designs and disclosures respecting the Project were drafted for Sensient by Advanced GeoServices Corp. ("AGC").  Because of the bulk of the entire bid document package and contract is not attached; relevant portions of the contract are attached hereto as Exhibit "A."  A full and complete copy of the bid and Contract documents are in the possession of Sensient.

## FACTS COMMON TO ALL COUNTS

5.      On or about February 12, 2001, NESI submitted the combined credentials of NESI, Pond Recovery Services and OBrien & Gere Laboratory ("OBG") as a team to bid on the Impoundment 4A Project.

6.      NESI was designated as the lead contractor; Pond Recovery Services would provide the dredging and OBG was designated as the entity that provided the stabilization mix design for a reagent that would react with the sludge material.

7.      On or about February 22, 2001, NESI was specifically invited to provide a bid for the Project and notified of the opportunity to complete a *visual* inspection of the site of work by "walking" the site.

8.      At no time prior to submitting its bid was NESI provided with the opportunity to complete any other investigation respecting the nature, composition and consistency of the materials contained in the impoundment/lagoon other than by the "site-walk" and as otherwise described below.

9.     On or about March 9, 2001, NESI attended the "site walk", during which time NESI was "encouraged" to take "samples" of the "sludge" materials to be removed in the recovery process of the impoundment/lagoon.

10.     At no time was NESI informed that the sludge was nonhomogeneous or that the sludge had different characteristics and densities at different locations within the impoundment/lagoon.

11.     AGS oversaw the process by which NESI obtained samples from locations adjacent to the shore line at or near the western end of the impoundment/lagoon.

12.     NESI avers, upon information and belief, that Sensient and its consultants specifically knew of the nature of the investigation by NESI, but did not indicate that the investigation was inadequate in any way or that the samples obtained by NESI would not accurately and completely indicate the nature and character of the sludge to be removed as a part of the contract.

13.     At no time did AGS disclose to or inform NESI that the the nature and character of the sludge to be removed as a part of the contract was non-homogenous with different densities or that portions of the sludge would require different means, methods and techniques to remove and treat the sludge.

14.     As a part of its pre-contract due diligence, the samples of the sludge obtained by NESI were submitted to the OBG laboratory for analysis and the development of the mix design of potential additives to the sludge so that NESI could create sludge with physical and chemical characteristics that could be handled with a dredging and conveyor system, that would allow for pumping of the sludge from the lagoon to an on-site landfill and which would achieve the density

required by the contract.

15.      OBG completed its analysis and characterized the physical properties of the sludge and determined that the chemical makeup of the sludge was primarily sodium chloride [salt] and acetate.

16.      Based upon the information derived from the analysis completed by OBG, NESI, Pond and OBG developed a methodology to handle and treat the sludge.

17.      Specifically, NESI, Pond and OBG developed a method that would work over a relatively wide range of moisture and solids content of the impoundment/lagoon,  that would be a continuous process to separate the solids from liquor utilizing vibratory screens and a pugmill to mix the reagent into sludge and create a cementitious mass that could be pumped  into the onsite landfill before solidifying to the required density.

18.      OBG developed a trade-secret, proprietary solidifying reagent for use in the process.

19.      Based on the developed methodology, which constituted a continuous process design and the proprietary reagent mix formula, NESI submitted a bid for the contract for the Project.

20.      In or about April, 2001, NESI was awarded the contract; however, for reasons not within the control of NESI,  the actual start of the project  was delayed until April, 2002.

21.      At no time after the award of the contract until February, 2002, was NESI permitted to enter onto the Project site.

22.      In the late summer or early fall of 2001, Sensient installed a cover over approximately one- half of the lagoon/impoundment, ostensibly to catch and collect storm water

KOP:289487v1 4834-02

before it became contaminated by mixing with the water and other materials in the impoundment/lagoon.

23.     In or about February, 2002, Sensient invited NESI to complete a "pilot"study and a partial mobilization to the lagoon/impoundment; Sensient paid NESI the sum of $50,000 dollars for the study.

24.     In response to the direction from Sensient, NESI mobilized the dredge and a vibratory screener, along with several other pieces of equipment and delivered to the site containers with the proprietary reagent to conduct the study.

25.     Because of the cover on the impoundment/lagoon, NESI was restricted to the open east-side of the lagoon/impoundment to place the dredge and complete the study.

26.     The "pilot" study revealed that the particle size of the sludge, when the energy of the dredge and pumps was applied, became too small to be effectively screened because the large salt crystals that had formed in the impoundment were being broken and re-dissolved into a supersaturated liquid state.

27.     As a result, little sludge would be removed; instead, because the crystals re-dissolved, quantities of supersaturated liquid were being returned to the lagoon while little sludge was being removed.

28.     Based on this study, it was determined that NESI's rate of production would be insufficient to meet the project schedule.

29.     The study did establish that the proprietary reagent mix design did function as designed and was deemed by all a complete success.

30.     Based upon the test study information, NESI was forced to completely redesign its

anticipated process, methodology and technique upon which it had based its bid so as to specifically eliminate the vibratory screeners and limit the agitation of the sludge materials and decrease the return of the materials to the supersaturated solution.

31.     Based on the information derived from the study, it was also determined that the sludge material had a composition that was easily be dredged and pumped as a product (liquid and solids together).

32.     Based on the information derived from the study, NESI considered that thickening of the sludge might require the installation of a mixing tank that would allow the salt solids to precipitate to the bottom of the tank. but still stay in suspension due to the super-saturation of the liquid before introduced into the pugmill.

33.     Based on the information derived from the study, NESI further considered that it would use the dredge to produce a thicker slurry with, more suspended solids by recirculating the sludge within the lagoon/impoundment before pumping it over to the mixing tank.

34.     In early April of 2002, NESI fully mobilized to the site, anticipating that it would employ the means and methods upon which it had based its bid.

35.     Notwithstanding the chemical tolerances and necessity that the chemical composition of the contents of the lagoon/impoundment remain essentially static, at all times relevant hereto, Sensient continued to utilize the lagoon/impoundment discharged additional waste materials into the lagoon/impoundment

36.     As a matter of specification, NESI was to treat the sludge within the lagoon/impoundment so that when the materials were placed in the on-site landfill that the treated materials would achieve a minimum compressive strength of one ton per square foot.

KOP:289487v1 4834-02

37.    NESI utilized a "mud balance" as an indicator of the percent solids for the treatment process.

38.    Mud balance readings were taken on the incoming material into the mixing tank and from the treated material before it was pumped to the landfill to determine the necessity of the amount of reagent needed to achieve the required densification of the materials.

39.    If the material pumped from the lagoon was too liquid, or if there were not enough solids, then there would be a greater amount of reagent needed to solidify the materials.

40.    Notwithstanding there being no contract specification or limitations, at all times, however, NESI was limited by Sensient to a 35% bulking factor, which limited the amount of reagent that could be utilized.

41.    All NESI testing had shown that it could solidify the sludge over a range from 40% to 80% moisture with an admixture from 20%to 25%; the only variable that was affected was the cure time to achieve the required compressive strength which would range from 8 minutes to 2 hours.

42.    Shortly after mobilizing to the site on April 29, 2002, NESI removed the cover from the western side that Sensient had installed over the impoundment/lagoon.

43.    Upon removing the cover, it was observed that the covered-western side of the lagoon was considerably more "gelatinous" or "solid" than uncovered, the eastern side of the impoundment/lagoon where NESI had completed its pilot study.

44.    The undisclosed, undiscoverable non-homogeneous nature of the materials throughout the lagoon/impoundment immediately affected the methodology of NESI's operations that had been established through the pilot study.

KOP:289487v1 4834-02

45.     NESI initially attempted to create a more uniform material by dredging the materials on the eastern side and mixing these materials with the materials on the western side of the impoundment/lagoon in order to raise the solid content before pumping to the mixing tank for treatment.

46.     During this time (April through July), and with this additional work, NESI was relatively consistent in moving the material from the impoundment to the mixing tank and achieving the imposed pre-treated mud balance of 10.7.

47.     However, as the slurry mix was pumped from the eastern side of the impoundment/ lagoon, the levels of the materials in the impoundment/lagoon appeared to be reduced at disparate rates, with the levels on the eastern side lowering at a greater rate than the western side.

48.     Because the slurry was to be a homogenous material, and anticipated to perform as a "liquid", the reduction in the surface elevation of the impoundment/lagoon was also expected to be uniform.

49.     NESI investigated these visually observable conditions and moved the dredge diagonally across the impoundment/lagoon from east to west.

50.     NESI discovered that area of the sludge that had been cover and under approximately one foot of gelatinous liquid had solidified into a large monolithic mass.

51.     NESI attempted to address this undisclosed and unknown condition with alternative methods described below.

52.     Initially, NESI attempted to utilize the cutter head of the dredge to cut into the edge of this mass; this method was unsuccessful.

53.     NESI thereafter mounted liquid recirculating water canons on the dredge pump to use a combination of mechanical cutting and water blasting erosion to create a slurry that would be thick enough for stabilization but could still be pumped..

54.     Because of the consistency of the monolithic mass, many times the pieces that would break off (approximately the size and hardness of a golf ball) would clog up either the dredge pump or the pumps from the mixing tank requiring the operations to shut down in order to clear out the obstructions.

55.     To address this problem, NESI next devised baskets and strainers as well as jet pump water canons in a constant attempt to ameliorate the problems.

56.     Each interim solution and attempt to address the conditions required extensive time and that NESI incur costs to fabricate and implement the new solutions.

57.     Notwithstanding NESI's best efforts, the operations resulted in a continuous, non-homogeneous slurry that when pumped, initially extracted a less dense slurry.

58.     NESI continuously attempted to produce a relatively homogenous slurry in the impoundment before pumping  to the mixing tank.

59.     NESI encountered occasions when the dredging operations actually ran out of liquid to pump and NESI was forced to stop and pump liquid from an adjacent impoundment to create a moveable sludge.

60.     On August 8, NESI abandoned the use of the conveyor line then being utilized and converted to a "batch process" due to the inconsistent flow of pumpable, high solid sludge that would be consistent with the limitations and proper use of the reagent.

61.     NESI thereafter constructed a "mixing box" from concrete barriers and utilized

the pugmill as the reagent delivery system.

62.     An excavator was positioned to mix the materials within the mixing box and thereafter load the mixed materials into articulating end dump trucks for delivery to the landfill.

63.     This new operation permitted only one batch at a time to be completed before being transported to the landfill.

64.     On or about August 15, 2002, NESI detected a very strong ammonia odor emanating from the impoundment and the liquid in the impoundment had changed color to a dark brown from the normal black

65.     Prior to August 15, 2002, NESI had been utilizing a proprietary reagent mix design developed by O'Brien & Gere Laboratory for this project that had a pozzalanic makeup, that formed a relatively non-reversible, cementitious material when it reacted with the waste brine dye sludge from the Sensient plant.

66.     The reaction between the reagent and brine dye sludge from the Sensient plant was exothermic that thereafter  cured to the required compressive strength within a short period of time.

67.     NESI avers, upon information and belief, that the chemical make-up of the waste brine dye sludge from the Sensient plant changed due to the activities of Sensient including the disparate discharges into the lagoon/impoundment.

68.     One result was that NESI was forced to alter the amounts of the reagent in an attempt to overcome the changes caused by Sensient, all at the additional cost and expense to NESI.

69.     Additionally, the treated materials with the altered chemical composition would

not set up or cure but would remain like "soup."

70.     Upon information and belief, the reaction of the ammonia and lime resulted in the formation of millions of bubbles within the treated sludge, that resulted in a radically changed specific gravity of the material.

71.     The materials that were created with the very strong ammonia odor had a sponge or cork-like matrix with thin walls that would not meet the compaction test criteria.

72.     As of the end of August, 2002, because of the hardness of the monolithic materials in the western end of the impoundment, NESI's dredge was only capable of only "nibbling" at the edges and pumping too much, liquid in relationship to the solids.

73.     As of the end of August, 2002, the water canons were minimally effective in eroding the monolithic materials.

74.     As of the end of August, 2002, all productivity had been effectively been foreclosed.

75.     In order to continue with the project, NESI thereafter developed a new strategy with a specially rigged "Pit Hog" grinder pump suspended from a crane.

76.     The "Pit Hog" had an exposed, high powered cutting wheel on the bottom and a slurry gate and was powered by its own hydraulic power pack.

77.     The concept developed by NESI was to lower the grinder pump onto the monolith and dig into it with the cutting wheel while simultaneously slurrying the liquid.

78.     Although the system did succeed. in cutting into the hardened material, Sensient was ostensibly concerned about the amount of reagent that NESI was utilizing to stabilize the sludge.

KOP:289487v1 4834-02

79.    Specifically, Sensient informed NESI that it could not stabilize the material until NESI had mud balance readings in excess of 12, notwithstanding the fact that this criteria is found no where in the Contract Specifications.

80.    Specifically, there were no specifications for mud balance minimums in any contract documents and Sensient's imposition of this requirement caused processing delays.

81.    On or about October 11, 2002, NESI received direction to totally change the process again.

82.    At that time, Sensient changed the scope of work  from an impoundment rejuvenation to a closure; this meant that NESI was to completely empty the lined impoundment/lagoon.

83.    NESI's method to complete this changed work was to enter the impoundment with long-stick excavators, positioned on protective mats; the hardened monolithic mass then would be excavated and moved to the mixing box via the buckets in a daisy-chain line up with two long stick excavators with another excavator to mix and load the mixed materials onto the articulated end dump trucks.

84.    This proposed method was approved and NESI added the required equipment together with another excavator and a dozer to spread the material in lifts at the landfill.

85.    Notwithstanding NESI's use of 60,000 pound excavators,  this heavy excavation equipment had difficulty in breaking into this mass.

86.    NESI continued with the work, but because of the extended duration of the project due to the changed and undisclosed conditions, NESI was forced to work through the winter of 2002 - 2003.

87.     As a result of the foregoing, NESI was forced to work in an extremely corrosive environment that caused damage and premature deterioration of NESI's equipment.

88.     NESI completed the project in the beginning of April of 2003.

89.     All conditions precedent to the rights of NESI and the liability of Sensient have been satisfied.

## COUNT I - BREACH OF CONTRACT

90.     NESI incorporates all of the above paragraphs as if fully set forth here at length.

91.     Sensient failed to disclose to NESI all material facts respecting the conditions that would be encountered at the lagoon/impoundment.

92.     Throughout the Project, Sensient made changes to the conditions and consistency of the impoundment/lagoon, which resulted in the necessity for NESI to perform additional and extra work.

93.     Sensient directed NESI to proceed with its work notwithstanding Sensient's express or implied knowledge that the conditions encountered at the lagoon/impoundment were materially different that those upon which NESI had based its bid.

94.     Sensient required NESI to complete work beyond the contract requirements and in conditions not disclosed or identified by Sensient for which compensation is due but remains unpaid.

95.     The conditions encountered by NESI resulted in a cardinal change to the contract, for which NESI was entitled to compensation and for which Sensient is liable as a matter of law.

96.     NESI is entitled to be compensated for the additional and extra work imposed by Sensient as a result of the following:

KOP:289487v1 4834-02

a.   All costs of acceleration and related additional and extra work, including cost related to the extended duration of the project;

b.   All costs caused by the conditions and required changes to NESI's planned means and methods to complete the Project;

c.   Sensient's failure to issue timely extensions to the contract (which contained liquidated damages) which required acceleration by NESI;

d.   Sensient's failure and refusal to promptly, fairly and timely address the deficiencies in its plans and drawings, including the failure to disclose conditions known or which should have been known to Sensient.

97.   Sensient materially breached the underlying Contract as described more fully described herein.

98.   Despite demand by the NESI and its contractual obligation to do so, Sensient refuses to issue change orders as required by the contract, to compensate Neuber for the work performed and material misrepresentations in the contract documents, and pay all sums due under the contract.

99.   As a result of these breaches of contract, plaintiffs have incurred damages in excess of $ 723, 277.18.

WHEREFORE, Neuber Environmental Services, Inc., demands judgment against Sensient Technical Colors in an amount in excess of $ 723, 277.18. together with prejudgment and post judgment interest, costs, fees and attorneys' fees as permitted by law as pleaded below, and such additional relief as the Court deems appropriate.

## COUNT II - QUANTUM MERUIT; UNJUST ENRICHMENT AS A SEPARATE COUNT AND IN THE ALTERNATIVE

100.   NESI incorporates by reference all prior paragraphs as though fully set forth.

101.   The work performed by NESI substantially benefitted Sensient because NESI's

labor and work on the Project directly contributed to completion of the rejuvenation of Impoundment 4A .

102.    Sensient knew and reasonably expected to pay for the work performed by NESI on the Project.

103.    Sensient has not paid NESI for the value of the work performed on the Project.

104.    Sensient will be unjustly enriched if it is not required to pay NESI for the work performed on the Project.

105.    The value of the work performed by NESI but for which Sensient has not paid NESI is in excess of $ 723, 277.18. .

WHEREFORE,  Neuber Environmental Services, Inc., demands judgment against Sensient Technical Colors in an amount in excess of  $ 723, 277.18 together with prejudgment and post judgment interest, costs, fees and attorneys' fees as permitted by law as pleaded below, and such additional relief as the Court deems appropriate.

## COUNT III - BREACH OF CONTRACTOR/SUBCONTRACTOR PAYMENT ACT

106.    NESI incorporates all of the above paragraphs as if fully set forth here at length.

107.    Sensient's payment obligations to NESI are  governed by, among other things, the Contractor and Subcontractor Payment Act, 73 P.S. § 501 et seq. ("the Act").

108.    NESI fully performed its obligations under the contract with Sensient.

109.    Sensient did not and has not provided NESI with timely notice of deficiency items as required by the Act.

110.    Sensient's failure to pay NESI and failure to pay in a timely fashion violates the Act.

KOP:289487v1 4834-02

111.    Sensient has refused to provide any reasons justifying continuing to withhold the payment for all work completed by NESI.

112.    Sensient's withholding of payment from NESI is in bad faith.

113.    Based upon Sensient's  failure to comply with the Act, NESI is entitled to interest, penalties and attorneys fees.

114.    Said interest and penalties under the Contractor and Subcontractor Payment Act continue to accrue.

WHEREFORE,  Neuber Environmental Services, Inc., demands judgment against Sensient Technical Colors in an amount in excess of $ 723, 277.18. together with prejudgment and post judgment interest, costs, fees and attorneys' fees as permitted by the Act as pleaded above, and such additional relief as the Court deems appropriate.

## COUNT IV - CONVERSION

115.    NESI incorporates all of the above paragraphs as if fully set forth here at length.

116.    At all times relevant hereto, Sensient knew that the formulation of the reagent developed by OBG for NESI was proprietary and a trade secret owned and controlled by NESI.

117.    NESI owns and controls all rights to the formulation of the reagent.

118.    Notwithstanding, Sensient converted the formulation to its own use and benefit by incorporating and disclosing the proprietary information into the bid documents for the closure of another impoundment/lagoon at Sensient's site.

119.    At no time did NESI grant Sensient the right or license to utilize the formulation.

120.    It is believed and averred that Sensient effected the aforesaid conversion intentionally and maliciously, for the purpose of harming NESI, by obtaining and thereafter

KOP:289487v1 4834-02

converting the formulation for its own economic benefit and thereafter obtaining economic benefits in the closure of other impoundments and lagoons, including those at the Sensient site.

121.    It is believed and averred that Sensient effected the aforesaid conversion intentionally and maliciously,  in conscious and/or reckless disregard of the damages being caused thereby, all for the purpose of causing Sensient to profit unlawfully at NESI's expense, as described in more detail above.

WHEREFORE,  Neuber Environmental Services, Inc., demands judgment against Sensient Technical Colors in an amount in excess of $50,000.00, interest, costs, punitive damages as appropriate, costs, interest and such other relief as the Court may deem appropriate.

## COUNT IV - NEGLIGENT MISREPRESENTATION

122.    The averments in the foregoing paragraphs are hereby incorporated as if set forth in full herein.

123.    Sensient negligently made false representations to, and concealed facts and information from NESI, as set forth above, for purposes of inducing NESI's reliance thereon.

124.    NESI reasonably and foreseeably relied upon Sensient's misrepresentations and concealments, thereby suffering the damages as claimed herein.

125.    Plaintiffs suffered the damages claimed herein by virtue of the aforesaid conduct.

WHEREFORE,  Neuber Environmental Services, Inc., demands judgment against

KOP:289487v1 4834-02

Sensient Technical Colors in an amount in excess of $50,000.00, interest, costs, interest and such other relief as the Court may deem appropriate.

5 · 13 · 05

**Powell, Trachtman, Logan,**
**Carrle & Lombardo, P.C.**

By: _____

Paul A. Logan
Frederick M. Brehm
Attorneys for Plaintiff, Neuber
Environmental Services, Inc.

KOP:289487v1 4834-02

## VERIFICATION

I, Jeffrey A. LaRiviere, verify that I am the Vice President of Neuber Environmental Services, Inc. and that I am authorized to make this affidavit on its behalf. I further verify that the averments contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

I understand that the statements herein are made subject to the penalties of 18 Pa. CS. §4904 relating to unsworn falsification to authorities.

Dated: 5-12-05

Jeffrey A. LaRiviere

**SENSIENT™**
Sensient Technical Colors

Werner Jenkinson Company, Inc. DBA
Sensient Technical Colors
2529 Main Street • Birdsboro, PA 19508, USA
610-582-8765 • Fax: 610-582-8685

**PURCHASE ORDER: G19668**

BILL TO:   P.O. Box 810
           Birdsboro, PA 19508

SHIP TO:   2529 Main Street
           Birdsboro, PA 19508

VENDOR:   Neuber Environmental Services, Inc.
          42 Ridge Road
          P. O. Box 541
          Phoenixville, PA 19460

          Tel: 610-933-4332
          Fax: 610-983-9884

SUBJECT TO ALL TERMS AND CONDITIONS
ON THE FACE AND BACK HEREOF

PERFORMANCE OF THIS ORDER SHALL
CONSTITUTE ACCEPTANCE OF THIS
ORDER AND THE TERMS AND CONDITIONS THEREOF.

| TAX STATUS: | | |
|---|---|---|
| Taxable | Partial | Non-Tax |
| | NT = Non Taxable | |

| Date Ordered | Date Required | Terms | Shipping Point | Cost Center |
|---|---|---|---|---|
| 04/03/02 | | | | 102090.2145 |
| | | | | Description for Cost Center/Use for Order |

| Quantity | Description | Price |
|---|---|---|
| | Provide services in accordance with contract documents for Impoundment #4A Rejuvenation dated March 1, 2001, Neuber bid dated April 11, 2001, and revised bid form included with Neuber letter dated March 7, 2002. | $1,415,180.17 |

SIGNATURES:

| Requested by:   J. Ammend | Authorization #1   Daniel J. Victor |
|---|---|
| Authorized Buyer   Thomas R. Miller 3rd *Thomas R. Miller 3rd* | Authorization #2 (if applicable) |
| | Authorization #3 (If applicable) |

DISTRIBUTION: AlphaFile/PO#File/AP/Rec

**FAXED**
4/3/02   11:15 Pm

## TERMS AND CONDITIONS OF PURCHASE

1. By accepting or filling this order or render services under this order Seller or Contractor agrees to its terms and conditions, which shall prevail over any inconsistent provisions in any form or other paper submitted by Seller or Contractor. This order shall constitute the entire agreement between the parties unless modified in writing by both parties.

2. Cash discount period shall be computed as commencing with receipt of invoice or of goods, or with completion of services, whichever is received later.

3. Goods delivered or services rendered under this order shall be subject to inspection and test at Buyer's plant (or, if purchased for export, at ultimate destination abroad), or the service site. Any goods in whole or in part may be returned at Seller's expense for transportation and insurance both ways if found within a reasonable time and date of their opening to be defective or not in accordance with the order. Acceptance of all or part of the goods, or payment thereof, or failure to notify Seller Promptly, shall not waive or affect Buyer's right to cancel or return all or part of the goods, or recover damages, or recover upon Seller's warranties or agreements of indemnity. Services rendered to Buyer by Contractor are subject to inspection and acceptance. Services performed not to Buyer's satisfaction shall be corrected at Contractor's sole cost and expenses within the time frame requested by Buyer.

4. Buyer may cancel all or any part of this order or may refuse to accept, or may return at Seller's expense, any goods if Seller fails to deliver the goods within the times specified in this order (time being of the essence thereof), or fails to deliver all or any part of the goods in accordance with the terms. Acceptance of part of the order shall not oblige Buyer to accept later shipments, nor affect its right to return goods already accepted. Buyer may cancel this order and terminate Contractor at any time if Contractor's services are of poor quality, services rendered are not on time or Contractor fails to obey Buyer's safety, environmental or any other rules or instructions.

5. Seller or Contractor agrees to pay all taxes now or hereafter imposed by law upon or on account of the production, sale, shipment or use of any goods or services covered by this order.

6. Seller or Contractor represents, and will state on its invoices, that all goods delivered or services rendered under this order will have been produced or performed in accordance with the Fair Labor Standards Act of 1938, and relevant OSHA regulations as amended and the regulations and orders issued thereunder. Seller or Contractor further represents that such goods or services comply with all other applicable federal, state and municipal laws, rules and regulations, and Seller or Contractor will indemnify and hold Buyer and its customers harmless against all liability and expenses, including counsel fees, resulting from failure of such compliance.

7. Seller or Contractor will indemnify and hold Buyer and its customers harmless against all liabilities and expenses, including counsel fees, arising from actual or claimed infringements of patent, trademark, copyright or other rights, misappropriation of trade secrets, breach of confidential relationship, negligence, breach of implied or express warranty, injuries or damages, with respect to the goods or services covered by this order. Seller or Contractor specifically agrees to indemnify and hold harmless Buyer against all liabilities and expenses including counsel fees arising from injury or damage claims or lawsuits filed against Buyer by employees, agents or representatives of Seller or Contractor with respect to the goods or services covered by this order.

8. Seller warrants to the Buyer and its customers that all goods delivered under this order will be of merchantable quality, free from any latent or patent defects, will conform to Buyer's specifications or samples, and will be safe for its intended use. Seller will indemnify and hold Buyer and its customers harmless against all liability and expenses, including counsel fees, consequential, incidental and special damages, lost production and profits arising from any breach of such warranty. Contractor warrants to Buyer that all services under this Order will be performed on schedule in a professional manner, and in conformance with all specifications and industry standard. Contractor will indemnify and hold Buyer harmless against all liabilities and expenses, including counsel fees, consequential, incidental and special damages, lost production and profits, arising from any breach of such warranty.

9. Unless otherwise stated in this order, no charge will be allowed for packing, boxing cartage or insurance, and Seller or Contractor shall prepay all shipping charges.

10. If no price is specified in this order, the goods or services shall be billed at the price last quoted to Buyer, or at the prevailing market price, whichever is lower.

11. Buyer may cancel all or part of this order, or at its option may extend the specified delivery period, or service completion date in the event that its ability to use or resell the goods or services covered by this order should be adversely affected, directly or indirectly, by labor troubles or by casualties or other circumstances beyond Buyer's reasonable control.